**U.S. DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

UNITED STATES OF AMERICA, EX
REL; AND GAYLE TRAVER, RELA-
TOR;

      *Plaintiffs*,                            Case No. 5:18-CV-00653-JKP

v.

GONZABA HEALTH SYSTEMS AS-
SOCIATES PA, D/B/A GONZABA
MEDIAL GROUP; WILLIAM GON-
ZABA, DAVID PADILLA, UNITED
HEALTH GROUP, INC., WELLMED
MEDICAL MANAGEMENT, INC.,
AMERIGROUP CORP.,

      *Defendants*.

## MEMORANDUM OPINION AND ORDER

Before the Court are five motions to dismiss:

(1)    Gonzaba Health Systems Associates PA d/b/a Gonzaba Medical Group's Motion to Dismiss, (*ECF No. 109*);

(2)    William Gonzaba's Motion to Dismiss, (*ECF No. 110*);

(3)    David Padilla's Motion to Dismiss, (*ECF No. 111*);

(4)    United Health Group Inc. ("United") and WellMed Medical Management Inc.'s ("WellMed") Motion to Dismiss, (*ECF No. 106*); and

(5)    Amerigroup Corp.'s Motion to Dismiss, (*ECF No. 108*).

Also before the Court is United and WellMed's Motion to Strike, (*ECF No. 107*). The parties

fully briefed the motions; therefore, they are ripe for ruling. *See ECF Nos. 120, 121, 124, 125,*

*126, 127, 128, 129*. Upon consideration, the Motions to Dismiss, (*ECF Nos. 106, 108, 109, 110, 111*), will be granted and United and WellMed's Motion to Strike, (*ECF No. 107*), will be denied as moot.

## BACKGROUND

On June 28, 2018, Relator Gayle Traver ("Traver") filed this action in the name of the United States alleging violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. *See ECF No. 1*. Traver names as Defendants: (1) Gonzaba Health Systems Associates PA d/b/a Gonzaba Medical Group ("Gonzaba Medical Group"); (2) William Gonzaba; (3) David Padilla; (4) United Health Group Inc. ("United"); (5) WellMed Medical Management Inc. ("WellMed"); and (6) Amerigroup Corp. ("Amerigroup"). *Id.*; *see also ECF No. 104*. In general terms, Traver alleges Defendants submitted or caused the submission of false claims. *ECF No. 104* at 1. Per Traver, she worked as a contractor for Gonzaba Medical Group from September 2017 to December 2017. *Id.* at 10.

Particular to the causes of action asserted against Gonzaba Medical Group, William Gonzaba (founder and Chief Executive Officer of Gonzaba Medical Group), and David Padilla (Medical Director of Gonzaba Medical Group), Traver alleges, generally, these Defendants engaged in fraudulent medical billing practices to inflate payments from Medicare. *See ECF No. 104* at 30. As Traver alleges, William Gonzaba and David Padilla "orchestrated the scheme to submit false and/or fraudulent claims, records and/or statements to receive increased capitation rates by hiring an unlicensed foreign doctor to mine patient charts, overseeing the department responsible for carrying out the scheme to submit unsupported and/or non-current diagnosis

codes to [the Centers for Medicare and Medicaid Services ("CMS")], and training providers to inflate diagnoses during regular training meetings."[1] *Id.* at 31.

Particular to the cause of action asserted against United[2] (a provider for Medicare beneficiaries), WellMed (a subsidiary of United), and Amerigroup,[3] Traver alleges, among other things, United and Amerigroup "failed to take steps to detect and correct false diagnosis codes submitted by providers including [Gonzaba Medical Group]," prior to submitting information to CMS. *Id.* at 46. As Traver alleges, "[b]ecause the information submitted by . . . United and [Amerigroup] was not accurate to the best of their knowledge, information, and belief, these certifications were false." *Id.* at 48. By failing to correct the information, as Traver further alleges, "United and [Amerigroup] fraudulently avoid[ed] obligations to return overpayments."[4] *Id.* at 50.

On January 21, 2025, the United States declined to intervene in this action. *ECF No. 52*. Subsequently, the Court unsealed the case, (*ECF No. 54*), and thereafter Traver filed two amended complaints. *ECF Nos. 79, 98*. The Court then set a final pleading schedule for the parties and on October 3, 2025, Traver filed the operative Third Amended Complaint, (*ECF No. 104*).

Defendants now move to dismiss Traver's Third Amended Complaint. Defendants argue this case should be dismissed because Traver fails to allege any plausible causes of action under

---

[1] Per Traver's Third Amended Complaint, Traver alleges Gonzaba Medical Group, William Gonzaba, and David Padilla: (1) presented false claims (**Count 1**: Violation of 31 U.S.C. § 3729(a)(1)(A)); (2) used false records to get those claims paid (**Count 2**: Violation of 31 U.S.C. § 3729(a)(1)(B)); and (3) avoided obligations to return overpayments (**Count 3**: Violation of 31 U.S.C. § 3729(a)(1)(G)). *See ECF No. 104* at 54–57 (emphasis added).
[2] Traver groups together Defendant United Health Group Inc. and Defendant WellMed Medical Management Inc., referring to them as "collectively 'United.'" *ECF No. 104* at 4. The Court will not do so. Reference in this Opinion to "United" represents Defendant United Health Group Inc. solely and not WellMed Medical Management Inc. Further, reference in this Opinion to "WellMed" represents Defendant WellMed Medical Management Inc. solely.
[3] Traver refers to Defendant Amerigroup Corp. as "WellPoint" in Relator's Third Amended Complaint. *ECF No. 104* at 4. For clarity, reference in this Opinion to "Amerigroup" represents Defendant Amerigroup Corp.
[4] Per Traver's Third Amended Complaint, Traver alleges United: (1) presented false claims (**Count 4**: Violation of 31 U.S.C. § 3729(a)(1)(A)); (2) used false records to get those claims paid (**Count 5**: Violation of 31 U.S.C. § 3729(a)(1)(B)); and (3) avoided obligations to return overpayments (**Count 6**: Violation of 31 U.S.C. § 3729(a)(1)(G)). *See ECF No. 104* at 57–60 (emphasis added). Similarly, Traver alleges Amerigroup: (1) presented false claims (**Count 7**: Violation of 31 U.S.C. § 3729(a)(1)(A)); (2) used false records to get those claims paid (**Count 8**: Violation of 31 U.S.C. § 3729(a)(1)(B)); and (3) avoided obligations to return overpayments (**Count 9**: Violation of 31 U.S.C. § 3729(a)(1)(G)). *See ECF No. 104* at 61–63 (emphasis added).

the False Claims Act, 31 U.S.C. § 3729 *et seq. See generally*, *ECF Nos. 106, 108, 109, 110, 111*. More specifically, Defendants argue Traver does not plead her claims with sufficient particularity, as required by Federal Rule of Civil Procedure 9(b). *Id*.

## LEGAL STANDARD

To provide opposing parties fair notice of the asserted cause of action and the grounds upon which it rests, every pleading must contain a short and plain statement of the cause of action which shows the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To satisfy this requirement, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555–558, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The focus is not on whether the plaintiff will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted causes of action. *Id.*; *Twombly*, 550 U.S. at 563 n.8. Thus, to warrant dismissal under Federal Rule 12(b)(6), a complaint must, on its face, show a bar to relief or demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Fed. R. Civ. P. 12(b)(6); *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986).

Dismissal "can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Frith v. Guardian Life Ins. Co.*, 9 F. Supp.2d 734, 737–38 (S.D. Tex. 1998). "[T]he court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could

prove consistent with the allegations in the complaint." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999); *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir. 1996).

In assessing a motion to dismiss under Rule 12(b)(6), the court's review is limited to the live Complaint and any documents attached to it. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). The court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims. *Id*. When reviewing the Complaint, the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones*, 188 F.3d at 324).

A Complaint should only be dismissed under Rule 12(b)(6) after affording ample opportunity for the plaintiff to state a claim upon which relief can be granted, unless it is clear amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Hitt v. City of Pasadena*, 561 F.2d 606, 608–09 (5th Cir. 1977); *DeLoach v. Woodley*, 405 F.2d 496, 496–97 (5th Cir. 1968). Consequently, when it appears a more careful or detailed drafting might overcome the deficiencies on which dismissal is sought, a Court must allow a plaintiff the opportunity to amend the Complaint. *Hitt*, 561 F.2d at 608–09. A court may appropriately dismiss an action with prejudice without giving an opportunity to amend if it finds the plaintiff alleged his best case or if amendment would be futile. *Foman*, 371 U.S. at 182; *DeLoach*, 405 F.2d at 496–97.

## ANALYSIS

As stated, Defendants argue this case should be dismissed because Traver fails to allege any plausible causes of action under the False Claims Act, 31 U.S.C. § 3729 *et seq. See general-*

5

*ly*, *ECF Nos. 106, 108, 109, 110, 111*. More specifically, Defendants argue Traver does not plead her claims with sufficient particularity, as required by Federal Rule of Civil Procedure 9(b). *Id.*

## I.    The False Claims Act

The False Claims Act ("FCA") imposes liability on any person who knowingly submits or causes to be submitted a false claim for payment of Government funds, knowingly makes or causes to be made a false record or statement material to a false claim, or conspires to commit any such violation. 31 U.S.C. § 3729(a)(1)(A)–(C). The FCA also imposes liability on any person who knowingly makes or causes to be made a false record or statement material to an obligation to transmit money to the Government or knowingly conceals an obligation to transmit money to the Government (i.e., a reverse FCA cause of action). *Id.* at § 3729(a)(1)(G).

The elements of liability under the FCA are: "'(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due . . . '" *U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quoting *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017)). Thus, a "false claim" in the FCA context consists of a demand for money that induces the government to disburse funds or otherwise suffer immediate financial detriment. *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 385 (5th Cir. 2014), *abrogated by Wisconsin Bell, Inc. v. U.S. ex rel. Heath*, 604 U.S. 140 (2025).

"'In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant but instead results in no payment to the government when a payment is obligated.'" *U.S. ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 618 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019) (quoting *U.S. ex rel. Bain v.*

6

*Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004)). Therefore, a reverse false claim is where any person "us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see also U.S. ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 4:21-CV-02024, 2023 WL 2563239, at *4 (S.D. Tex. Feb. 10, 2023), *R. & R. adopted*, 2023 WL 2564342 (S.D. Tex. Mar. 17, 2023).

"The FCA may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government." *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 575 U.S. 650, 653 (2015) (internal quotations omitted).

## II. Legal Standard of Pleading in FCA Cases

A complaint filed under the FCA must meet the heightened pleading standard of Federal Rule 9(b), which requires a relator to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009); *U.S. ex rel. Integra Med Analytics, LLC*, 816 Fed. App'x. 892, 896 (5th Cir. 2020). Although the particularity required to meet this standard varies from case to case, at a minimum, "Rule 9(b) requires the 'who, what, when, where, and how' to be laid out"—i.e., "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Bowles v. Mars, Inc.*, No. 4:14-CV-2258, 2015 WL 3629717, at *3 (S.D. Tex. June 10, 2015) (quoting *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003)). This standard imposed in FCA cases ensures the com-

plaint "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs." *Grubbs*, 565 F.3d at 190.

To meet this pleading requirement, a relator's complaint that does not allege "the details of an actually submitted false claim, may nevertheless survive ***by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference those claims were actually submitted***, such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into. *Grubbs*, 565 F.3d at 190–91 (emphasis added). This pleading requirement must be imposed less stringently when the alleged fraud occurred over an extended period and consists of numerous acts. *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-03396, 2014 WL 2618158, at *10 (S.D. Tex. June 12, 2014), *on reconsideration in part*, 2014 WL 4388726 (S.D. Tex. Sept. 5, 2014) (quoting *U.S. ex rel. Foster v. Bristol–Myers Squibb Co.*, 587 F.Supp.2d 805, 821 (E.D. Tex. 2008)). However, even under this "relaxed" standard, the plaintiff must adhere to the basic rule that the complaint must include a sufficient factual basis to support the relator's belief that a defendant engaged in a fraudulent scheme. *Ruscher*, 2014 WL 2618158, at *11 (quoting *Foster*, 587 F. Supp. 2d at 822); *see also Frey*, 2023 WL 2563239, at *7.

### III.    Application

#### A.    Federal Rule of Civil Procedure 9(b) and Collective Pleading

In the Third Amended Complaint, Traver repeatedly refers to Gonzaba Medical Group, William Gonzaba, and David Padilla as "collectively the 'Gonzaba Defendants.'" *See ECF No. 104* at 4. Traver also repeatedly refers to United and WellMed as "collectively 'United.'" *Id*.

As the Court recently detailed in another civil *qui tam* action:

> The pleading requirements of Federal Rule [of Civil Procedure] 9(b) ["Rule 9(b)"] must be satisfied as to each named Defendant. Therefore, a pleading that contains allegations of a scheme pertinent to a group of Defendants or that alleges general conduct performed by a group of defendants does not satisfy the heightened pleading requirements of [] Rule 9(b) . . . Attributing discrete actions to all defendants without explaining the basis for the grouping or distinguishing between the relevant conduct of each defendant is insufficient to meet the pleading requirement of [] Rule 9(b) for allegations of violation of the FCA . . . Rather, the complaint must segregate the alleged wrongdoing of each of the named defendants.

*U.S. v. Parkland Health and Hosp. System*, No. 5:23-CV-00381-JKP, 2026 WL 64298, at *5 (W.D. Tex. Jan. 6, 2026). Thus, to the extent Traver includes in the Third Amended Complaint general allegations, which group the "Gonzaba Defendants" and "United" together, those allegations fail to segregate the alleged wrongdoing of one from those of another and do not meet the requirements of Rule 9(b). *In re Urcarco Sec. Lit.,* 148 F.R.D. 561, 569 (N.D. Tex. 1993), *aff'd*, *Melder v. Morris,* 27 F.3d 1097 (5th Cir. 1994). With this in mind, the Court proceeds to its analysis, seeking out individualized allegations against Defendants.

### B.    Gonzaba Medical Group, William Gonzaba, and David Padilla

Due to Traver's collective pleading, and the fact that Traver does not connect specific allegations to specific causes of action, the Court's efforts largely focus on attempting to construe Traver's Third Amended Complaint. *See generally*, *ECF No. 104*. Under a section titled "DEFENDANTS' FRAUDULENT MEDICAL BILLING PRACTICES," Traver appears to assert two primary theories of liability relating to Defendants Gonzaba Medical Group, William Gonzaba, and David Padilla: (1) utilizing the chart-review process to inflate Medicare payments; and (2) pressuring physicians to increase diagnoses. *Id*. at 2–3, 30–44.

### 1.    Liability Theory: Utilizing the Chart-Review Process to Inflate Medicare Payments

The following allegations pertaining to this liability theory are excerpted from the Third Amended Complaint:

109. According to [Confidential Witness 1 ("CW1")], who was with Gonzaba Medical from November 2008 to November 2014, Defendant Padilla and Manuel Martinez routinely hired consultants every six to eight months, with more hired during the months of September to November when there was open enrollment for Medicare Advantage patients. Gonzaba Medical management instructed these consultants to add unsupported diagnoses to patients' charts. Gonzaba Medical, through Defendant Padilla and Manuel Martinez, wanted to ensure that the medical charts for new Medicare Advantage patients included as many diagnoses as possible, because the amount that would be paid to Gonzaba Medical for the following year [] would be determined based on the diagnoses given during the open enrollment period.

110. One such consultant is an individual named Alexander Malasenco ["Malasenco"]. Malasenco is a Russian-born doctor who is not licensed to practice in the United States and worked primarily outside the Gonzaba Medical offices. He reported to [Nettie Edwards, a registered nurse, who managed the Review of Medical History Department ("RMH Department")] and also directly to Defendant Padilla. Malasenco has been working for Gonzaba Medical since 2007 to the present . . .

111. From at least September 2017 to December 2017, while [Traver] worked as a nurse in the RMH department for Gonzaba Medical, she personally witnessed the process used by Malasenco to add numerous improper diagnoses codes to the patient charts. Relator's knowledge of the process was confirmed through additional discussions with Claudia Franco, [Traver]'s supervisor, who advised that the process was the same during Ms. Franco's tenure at Gonzaba which started in September 2015.

112. Approximately one to two months prior to a scheduled appointment for a Medicare Advantage patient, the "techs" in the RMH Department – individuals with no medical background or training – pulled upcoming Medicare patients' names and the dates of their upcoming appointments. From those records, the techs prepared a new Prep RMH.RAPS Worksheet ("Worksheet") for each patient. This was done for all [Medicare Advantage] patients.

113. It was Malasenco's practice to come to Gonzaba Medical's office where the RMH Department was located and pick up 250 Worksheets every Friday from Gonzaba Medical with the patients' information . . . Malasenco then remotely accessed Gonzaba Medical's patients' medical records and "data mined" them, identifying any and all additional diagnoses from their past medical records from other physicians and/or hospitals, including lab and x-ray reports, and put those additional diagnoses onto the Worksheets.

114. After Malasenco finished coding the Worksheets, every Friday, he returned to the Gonzaba Medical office to turn in the previous weeks' Worksheets with the new diagnosis codes and picked up 250 new Worksheets . . .

116. The diagnoses identified by Malasenco included diagnoses not supported by the patient's medical record and/or noncurrent diagnoses that did not require or affect patient care treatment or management, and, therefore, inclusion of the diagnoses did not comply with ICD coding guidelines . . .

117. Upon receipt of the Worksheets from Malasenco, the techs in the RMH Department processed the charts and then gave them to the nurses in the RMH Department, including [Traver], to review and add into the patients' medical records and the WellMed and [Amerigroup] [Risk Adjustment Processing ("RAP")] systems].

118. The nurses were instructed only to briefly verify Malasenco's new codes and then add the new diagnosis codes to the patients' electronic medical chart for their upcoming appointments. The electronic medical charts were pre-filled with diagnosis codes for the attending physician with pre-worded verbiage to substantiate the newly added diagnosis codes. The provider then would select the new diagnosis and verbiage added by the RMH Department nurses.

119. If a provider did not select a new diagnosis added to a patient's medical record by Malasenco, the medical record system would flag the diagnosis as outstanding. The RMH Department nurses, including [Traver] and America Villalon, would then follow up with the provider and, if a provider still did not select the diagnosis . . . Nettie Edwards . . . would put pressure on the provider to accept the new diagnoses. Providers very rarely failed to select the diagnoses indicated by Malasenco due to the pressure put on providers discussed below . . .

120. After entering diagnoses into patient medical charts, the nurses uploaded the new diagnosis codes from the electronic medical chart to the WellMed and [Amerigroup] RAP systems **prior to** the patient being seen by the attending physician.

121. The RMH Department received weekly reports from WellMed indicating which diagnoses have been accepted or rejected. The WellMed RAP system blanketly accepted everything except obvious duplicate diagnoses.

122. [Traver] and the other nurse reviewers, including [Claudia] Franco and [Judy] Riebe, were told by Nettie Edwards that they were not permitted to delete old or obsolete diagnosis codes from the WellMed RAP system. Therefore, if a physician did not accept a diagnosis identified by Malasenco, the diagnosis was not removed from WellMed's RAP system. In other words, the diagnosis was still submitted to WellMed even if a doctor rejected the diagnosis, which happened

11

very rarely given the pressure put on doctors to accept all of Malasenco's diagnoses, as discussed below. As a result, the improper diagnosis was included in the risk assessment of the patient and Gonzaba was paid based on that diagnosis and Gonzaba Medical did not return overpayments.

123. The Worksheets were returned by Malasenco to Gonzaba Medical, processed by the RMH techs, reviewed by the nurses, entered into the patients' charts, and uploaded into the WellMed RAP system, all of which was done on a weekly basis while Relator was employed by Gonzaba. In addition, based on Relator's discussions with her[] colleagues in the RMH Department, these same practices had been going on for years prior to Relator's employment.

*ECF No. 104* at 31–36 (emphasis in original). Traver lists the following purported examples of

inflated diagnoses resulting in the submission of false or fraudulent claims:

125. If a patient had a diagnosis that often would have a co-morbid diagnosis, Malasenco would add the co-morbid diagnosis even if the patient had never been diagnosed with it. For example, CW1 witnessed that if a patient had a diabetes diagnosis, Malasenco would add commonly co-morbid diagnoses such as diabetic retinopathy, diabetic nephropathy and if they were smokers, he would also add that the patient had a vascular disease . . .

126. According to CW1, if the patient had a condition, Malasenco assumed that the patient also had several related conditions and added to the Worksheets the corresponding diagnosis codes for those non-existent conditions. For example, multiple elderly patients were diagnosed with hypertension but nothing more. Malasenco assumed that the patients also had arthritis, glaucoma, coronary disease, debility, and/or pulmonary hypertension syndrome, and added additional diagnoses to the patients' Worksheets, which then made its way into the patients' charts and the RAPs system . . .

127. Malasenco also added diagnoses that may be suggested by a prior diagnostic test but had not been diagnosed by the treating physician. For example, the blood tests for multiple patients covered by a WellMed plan showed a low platelet count, either at the time of their examination or in their recent history. The attending physician did not address the low count in the patients' chart as something of importance. Malasenco, however, added a code into the chart for "thrombocytopenia," a chronic blood disease. Malasenco added this code even when the low count had been noted a year earlier and the platelet count was now at a normal level. [Traver] specifically addressed this issue with her supervisor, [Nettie] Edwards, yet was directed by [Nettie] Edwards to add the diagnosis code as a current condition in the patient's medical record and the RAPs system, even though it was not a current condition. The submission of suspected and unconfirmed diagnoses and diagnoses that did not require or affect patient care, treatment, or management

is in violation of the ICD-10-CM Guidelines and, therefore, constitutes a false claim.

128. In another example, for a 75-year-old female patient covered by a [] WellMed Plan and scheduled to see a Gonzaba Medical doctor on December 21, 2017, [a]ccording to the Worksheet that Malasenco notated after mining the patient's medical chart, [Traver] observed that Malasenco had added the code I70.203, which is unspecified atherosclerosis of native arteries of extremities, bilateral legs. According to Malasenco's notes that were seen by [Traver], he added this diagnosis because of a Doppler test (medical imaging procedure) conducted more than five years earlier . . . Malasenco also added the code of K86.1, which is the diagnosis code for chronic pancreatitis, based on an MRI scan that showed a patient had a diagnosis of pancreatic cyst, normally coded as K86.2 . . . [Traver] reviewed the patient's medical chart, which included no mention of chronic pancreatitis. Notably, K86.2 (pancreatic cyst) results in a lower MRA [Medical Risk Adjustment score] than K86.1 (chronic [] pancreatitis). [Traver] notified her supervisor, Nettie Edwards, of the discrepancy. Edwards told [Traver] that she was not to question Malasenco's codes because he is a doctor and [Traver] is not. Thereafter, [Nettie] Edwards directed [Traver] to enter Malesenco's new diagnoses codes into the patient's electronic medical chart. The diagnoses were then entered into the WellMed RAP system, as discussed below. The submission of suspected and unconfirmed diagnoses and diagnoses that did not require or affect patient care, treatment, or management is in violation of the ICD-10-CM Guidelines and, therefore, constitutes a false claim . . .

130. In one of the most extreme cases, [Traver] observed that a patient in his/her 70s had a history of substance abuse in the patient's early 20s. Malasenco coded the patient as having a current drug dependence problem, even though the medical record did not state that the patient had a current drug issue, was not being treated for it, and the last attending doctor did not note it as a current condition. The diagnosis was added to the patient's medical record and submitted to WellMed via the RAP system, as discussed below. The physician who saw the patient was a younger physician who did not question Malasenco's diagnoses and went along with Malasenco's improper diagnosis of substance abuse disorder for this patient.

131. Submitting diagnoses to CMS that are suspected and unconfirmed or did not require or affect patient care treatment or management during the visit violates ICD coding guidelines and, therefore, constitutes false claims. Since diagnoses identified by consultants such as Malasenco were entered by Gonzaba in the RAP system prior to patient visits, the failure to remove diagnoses from the RAP system that did not require or affect patient care treatment or management during the visit resulted in the submission of false claims to CMS.

*Id*. at 36–40.

### 2. Liability Theory: Pressuring Physicians to Increase Diagnoses

The following allegations pertaining to this liability theory are excerpted from the Third

Amended Complaint:

132. The nurses in the RMH Department "trained" the new physicians on how to add new diagnosis codes to the patient's medical file during the physician visit and which codes are higher paying. [Traver] was being trained to conduct the trainings of physicians before she left Gonzaba Medical.

133. Typically, such training sessions were scheduled on a monthly basis, and were attended by Defendant [David] Padilla on most occasions, and occasionally Defendant Gonzaba's sons, Dr. William Gonzaba, a doctor at Gonzaba Medical, or Greg Gonzaba, who works in the accounting department at Gonzaba Medical, as well as personnel from the RMH Department, including [Nettie] Edwards, [America] Villalon and [Traver]. The meetings were held at Gonzaba Medical's main office, and newly hired providers from the other clinics would come to the main office for the meetings. During [Traver's] time working at Gonzaba Medical, she attended two such meetings with Dr. [David] Padilla and approximately 8 to 10 providers in attendance at each meeting. During the meetings, the providers were given lunch, trained on how to add new diagnosis codes, and reminded that they could earn quarterly bonuses for their performance.

132. CW1 confirmed that Gonzaba Medical held monthly meetings for its providers that were led by senior Gonzaba Medical management, including Defendants William Gonzaba and [David] Padilla. At these monthly meetings, Defendants William Gonzaba or [David] Padilla "educated" their employees on how to increase the diagnoses, according to CW1. All of the doctors and some specialists (i.e., nephrology, cardiology, etc.) were regularly directed to attend the provider meetings . . .

135. According to CW1, Gonzaba Medical management routinely held weekly meetings every Thursday from 12 pm to 1 pm central time to review the top ten percent of high utilizers, namely the sickest patients who needed the most medical resources and therefore were the most expensive patients for Gonzaba Medical to provide care. These weekly meetings, known within Gonzaba Medical as the "High Risk" meetings, were mandatory for all the doctors at Gonzaba Medical, and were usually held by teleconference.

136. Discussion at the High Risk meetings often included direction by management to increase patient diagnoses, so as to increase the Case Mix Index and the fee per member per month paid to Gonzaba Medical. Defendant [David] Padilla and [Mary] Unger [a registered nurse who holds the title of Managed Care Chief Operator and supervises the RMH Department] routinely attended and led the meetings.

14

137. At the High Risk meetings, [Mary] Unger and Defendant [David] Padilla encouraged the physicians to make sure they documented every possible diagnosis, even if not treated or current. [David] Padilla and [Mary] Unger told the Gonzaba Medical doctors that the documentation brings in the revenue, and Gonzaba Medical gets a monthly capitation payment regardless of whether the patient comes into Gonzaba Medical for any services . . .

138. It has been Gonzaba Medical's practice to hire young, newer doctors who "do what they are told" and do not question Gonzaba Medical's billing practices.

139. The physicians at Gonzaba Medical had a "quarterly quota" for Medicare Advantage patients, according to CW1. If a physician hit his or her quota, the physician received approximately $5,000 as a bonus for that quarter. During the weekly High Risk meetings, Defendant [David] Padilla and [Mary] Unger routinely pushed the bonus incentive to the physicians . . .

140. [Traver] started to raise questions regarding Gonzaba Medical's chart review process almost immediately upon starting at Gonzaba Medical. She raised her concerns with another nurse, Judy Riebe, who worked in the RMH department, who responded that "they know" and to "just go with it." Riebe left shortly after [Traver] started because she too was uncomfortable with Gonzaba Medical's chart review process.

141. Within the first few weeks with Gonzaba Medical, [Traver] raised concerns about particular diagnosis codes added by Malasenco to her direct supervisor, Claudia Franco, who took the issue to their manager, [Nettie] Edwards. [Claudia] Franco was responsible for submitting diagnosis codes to WellMed and [Amerigroup] through the WellMed and [Amerigroup] RAP systems and also repeatedly expressed concern to [Nettie] Edwards that adding diagnosis codes based on Malasenco's review was improper. [Claudia] Franco went to Gonzaba Medical's Chief Compliance Officer to express concerns and asked to be transferred to another department. Shortly, after being transferred [Claudia] Franco was terminated by Gonzaba.

142. [Traver] repeatedly expressed concern directly to [Nettie] Edwards that the addition of unsupported diagnosis codes by Malasenco was improper. [Nettie] Edwards responded that Malasenco is a physician with more education than [Traver] and [Traver] will, therefore, do as she is told. After repeatedly questioning the practice, [Nettie] Edwards became hostile towards [Traver], ultimately causing [Traver] to resign prior to the end of her contract with Gonzaba Medical.

*ECF No. 104* at 40–42.

### a.    Whether Relator's Pleading Satisfies Rule 9(b)

#### i.    Particular Details of the Alleged Scheme

15

Defendants Gonzaba Medical Group, William Gonzaba, and David Padilla move to dismiss Traver's FCA causes of action because Traver's Third Amended Complaint fails to offer plausible and particular allegations detailing the overall scheme. *ECF No. 109* at 19; *ECF No. 110* at 12; *ECF No. 111* at 12. Having carefully reviewed Traver's Third Amended Complaint, the Court agrees, finding Relator fails to plead fraud with sufficient fact-based particularity.

In this case, the purported scheme does not involve any instance in which a specific false claim for payment by the government was submitted. However, this purported scheme could still support a cause of action under the FCA if Traver can sufficiently identify particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. *Grubbs*, 565 F.3d at 190.

Put simply, Rule 9(b) requires the "who, what, when, where, and how" of the fraud. *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Dismissal is appropriate if Traver offers only conclusory allegations, or if Traver cannot offer factual information with sufficient indicia of reliability or cannot demonstrate a strong inference that Gonzaba Medical Group, William Gonzaba, and David Padilla caused fraudulent claims to be submitted for payment by Medicare. *Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013).

Reviewing Traver's Third Amended Complaint, Traver does not tie any of the allegations regarding the purported fraud to Gonzaba Medical, William Gonzaba, or David Padilla, with the requisite particularity. Regarding the first liability theory—utilizing the chart-review process to inflate Medicare payments—Traver alleges she addressed the purported fraud with Nettie Ed-

16

wards (her manager), Claudia Franco (her direct supervisor),[5] and Judy Riebe (another nurse),[6] but there are no particularized allegations regarding Traver, Nettie Edwards, Claudia Franco, or Judy Riebe having any communications about the purported fraud with a representative for Gonzaba Medical, or William Gonzaba, or David Padilla. *ECF No. 104* at 37–42. Similarly, Traver alleges David Padilla "routinely hired consultants every six to eight months" and "[o]ne such consultant is an individual named Alexander Malasenco," but there are no particularized allegations David Padilla[7] (or any of the other Defendants) had any communications with Alexander Malasenco, much less that they directed or instructed him[8] to inflate Medicare payments. *ECF No. 104* at 33.

As to the second liability theory—pressuring physicians to increase diagnoses—Traver alleges Nettie Edwards "would put pressure on the provider[s] to accept the new diagnoses," but there are no particularized allegations regarding a representative for Gonzaba Medical, or William Gonzaba, or David Padilla, directing Nettie Edwards to do so or that Nettie Edwards was acting on behalf of these Defendants. *ECF No. 104* at 32. Similarly, there are no particularized allegations that provide examples or detail how Nettie Edwards would put pressure on the providers. *Id*.

Accordingly, the Court finds the Third Amended Complaint fails to plead the purported fraud in this case with sufficient particularity.

> ## ii. Reliable Indicia Leading to a Strong Inference of Improper Billing

---

[5] Traver alleges only that [Claudia] Franco went to Gonzaba Medical's Chief Compliance Officer to express concerns, but Traver does not identify who this individual is. *ECF No. 104* at 42.

[6] Traver alleges only that Judy Riebe told her "they know" and "just go with it," but Traver does not identify who "they" refers to. *ECF No. 104* at 42.

[7] Traver alleges only that Alexander Malasenco "reported . . . directly to Defendant Padilla." *ECF No. 104* at 33.

[8] Traver alleges only that "Gonzaba Medical management instructed these consultants to add unsupported diagnoses to patients' charts," but Traver does not identify who "management" refers to. *ECF No. 104* at 33.

In *Grubbs*, the Fifth Circuit found the relator provided reliable indicia to support his allegations by stating "the particular workings of a scheme [that were] communicated directly to the relator by those perpetrating the fraud," and the relator "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors . . . attempted to bring him into the fold of their on-going fraudulent plot." *Grubbs*, 565 F.3d at 191–92. The *Grubbs* relator also corroborated this allegation with descriptions of a meeting with nurses who tried to help him carry out the scheme, along with specific dates on which "each doctor falsely claimed to have provided services to patients." *Id.* at 192.

Here, Traver does not allege a representative for Gonzaba Medical, or William Gonzaba, or David Padilla communicated to her the workings of any fraud of billing Medicare or that she viewed any other indicia, like internal documents, evidencing such purported fraud or evidencing a representative for Gonzaba Medical, or William Gonzaba, or David Padilla's intention to improperly bill knowing any improper charges would be recovered from Medicare. *See Grubbs*, 565 F.3d at 191; *U.S. v. Cath. Health Initiatives*, No. 4:18-CV-00123, 2022 WL 2657131, at *10 (S.D. Tex. Mar. 31, 2022), *R. and R. adopted*, 2022 WL 2652135 (S.D. Tex. July 8, 2022). The Court does note that, in Traver's Third Amended Complaint, Traver points to a copy of one of Alexander Malasenco's worksheets "appended hereto as Exhibit 1." *ECF No. 104* at 38.[9] That Alexander Malasenco wrote diagnosis codes on the worksheet, however, does not indicate the diagnosis codes were ultimately submitted to CMS and that Gonzaba Medical ultimately received payment from Medicare. *See ECF No. 104* at 38.

Implication alone cannot satisfy the pleading requirements of Federal Rule 9(b), and Traver's allegations are too nebulous and unsupported by specific factual detail to support a claim for violation of the FCA based upon these theories of liability. *See Grubbs*, 565 F.3d at

---

[9] The Court located the Exhibit, attached to the Second Amended Complaint. *ECF No. 79-1.*

190. Thus, because Traver's pleading lacks both particular details and reliable indicia, Traver fails to plead anything that provides a strong inference that Gonzaba Medical, William Gonzaba, or David Padilla violated the FCA.

### b.    Whether Relator's Pleading Satisfies the FCA Substantive Requirements

### i.    Requisite Scienter

Defendants Gonzaba Medical Group, William Gonzaba, and David Padilla also move to dismiss Traver's FCA causes of action on substantive grounds. *See ECF Nos. 109, 110, 111.* These Defendants establish the Third Amended Complaint does not sufficiently allege the requisite scienter. *ECF No. 109* at 27–29; *ECF No. 110* at 15–16; *ECF No. 111* at 16–17.

The FCA's scienter requirement is high, and a relator may not simply allege that "the defendants knowingly did this or recklessly did that." *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994). The FCA's scienter element requires (1) "actual knowledge of falsity," (2) "deliberate ignorance of the truth or falsity of the information provided," or (3) "reckless disregard of the truth or falsity of the information provided." *U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458, 468 (5th Cir. 2009). The defendant must also act "with the purpose of getting a false claim paid by the Government." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009).

Under a section titled "DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED FALSE OR FRAUDULENT CLAIMS," Traver appears to address scienter with the following allegations:

> 176. By their conduct alleged in this complaint, each Defendant knowingly presented or caused to be presented, false or fraudulent claims; knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; knowingly made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government; and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money to the United States.

177. All of the Defendants knew that the intended and foreseeable consequence of their fraudulent scheme was the overpayment of claims submitted or caused to be submitted to the United States, or failure to return overpayments, pursuant to the Medicare Advantage program . . .

179. Defendants knew that truthful submission of encounter data, including diagnosis codes, is material to Medicare's decision to pay claims and is a material requirement of United's and WellMed's contracts with the United States, which requirements flowed to Gonzaba Medical. Defendants knew that the falsification of diagnosis codes is not only "capable of influencing," but in fact directly affects, the amount of reimbursement under the MA Program and renders the claim, via the encounter data, factually false.

180. As alleged throughout this complaint, each Defendant acted with actual knowledge that the diagnoses codes submitted by Gonzaba Medical to WellMed and [Amerigroup], and from United and [Amerigroup] to the United States, were not accurate, complete and truthful and were, in fact, factually false.

181. Alternatively, each Defendant acted with deliberate ignorance or reckless disregard as to the truth or falsity of the diagnoses codes submitted by Gonzaba Medical to WellMed and [Amerigroup], and from WellMed and [Amerigroup] to the United States.

*ECF No. 104* at 50–54. Traver's "vague group pleading approach cripples [her] ability to establish scienter."[10] Additionally, the Court cannot accept these allegations relating to scienter as sufficient because they are conclusory. These allegations therefore do not demonstrate that Gonzaba Medical Group, William Gonzaba, and David Padilla actually knew, deliberately ignored, or recklessly disregarded a falsity submitted to CMS in exchange for payment.

In Traver's Omnibus Response to the Motions to Dismiss, Traver argues she is not required to plead the FCA's knowledge element with particularity under Rule 9(b). *ECF No. 121* at 49. While it is true "Rule 9(b) expressly allows scienter to be 'averred generally,' simple allegations that defendants possess fraudulent intent will not satisfy rule 9(b)." *Dorsey v. Portfolio Eq-*

---

[10] *U.S. ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 4:21-CV-02024, 2023 WL 2563239, at *10 (S.D. Tex. Feb. 10, 2023), *R. & R. adopted sub nom. Frey v. Health Mgmt. Sys., Inc.*, No. 4:21-CV-02024, 2023 WL 2564342 (S.D. Tex. Mar. 17, 2023) (citing *U.S. ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 636 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019)).

*uities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (citing *Melder v.* Morris, 27 F.3d 1097, 1102 (5th Cir. 1994)). Instead, plaintiff    "must allege *specific facts* supporting an inference of fraud." *Id.* (emphasis in original). If facts are "peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief." *Id.* This relaxation of Rule 9(b), however, "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 2008).

Specifically regarding Gonzaba Medical Group, under the *Grubbs* standard Traver relies upon, Traver's Third Amended Complaint fails "because there is no indication that [Gonzaba Medical Group] itself acted with the requisite intent." *Grubbs*, 565 F.3d at 192. As the Fifth Circuit described in *Grubbs*:

> Under all sections of the False Claims Act, the defendant must act with the purpose of getting a false claim paid by the Government. Grubbs did not plead, argue at the district court, or on appeal that the Hospital was vicariously liable for the actions of the doctors or nurses. Without an attributed liability theory, no allegations in the complaint allow a reasonable inference that the Hospital had the requisite intent. The Hospital may have been inadvertently and in the normal course of business processing the claims of services fraudulently exaggerated by its doctors. We have no basis for inferring otherwise.

*Id*. Without an attributed liability theory, the *Grubbs* Court found the relator's complaint did not satisfy Rule 9(b) as to his employer, a hospital. *Id*. Traver's Third Amended Complaint here fails for the same reason.[11]

Similarly, as to William Gonzaba and David Padilla, Traver's Third Amended Complaint simply contains no allegations Defendants William Gonzaba and David Padilla were aware of

---

[11] *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) (citing *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068–69 (5th Cir.1994)) ("Accepting the plaintiffs' allegation of motive—basically that the defendant officers and directors were motivated by incentive compensation—would effectively eliminate the state of mind requirement as to all corporate officers and defendants. *See id.* The district court aptly dubbed this allegation "a nihilistic approach to Rule 9(b) jurisprudence.")

Alexander Malensco's alleged upcoding of patient charts. Traver's Third Amended Complaint is essentially devoid of allegations relating to William Gonzaba, and the allegations relating to David Padilla are also sparse.

Focusing first on William Gonzaba, Relator alleges:

100. Defendant . . . **William Gonzaba** . . . orchestrated the scheme to submit false and/or fraudulent claims, records and/or statements to receive increased capitation rates by hiring an unlicensed foreign doctor to mine patient charts, overseeing the department responsible for carrying out the scheme to submit unsupported and/or non-current diagnosis codes to CMS, and training providers to inflate diagnoses during regular training meetings . . .

132. The nurses in the RMH Department "trained" the new physicians on how to add new diagnosis codes to the patient's medical file during the physician visit and which codes are higher paying . . .

133. Typically, such training sessions were scheduled on a monthly basis, and were attended by . . . occasionally Defendant Gonzaba's sons, Dr. **William Gonzaba**, a doctor at Gonzaba Medical, or Greg Gonzaba, who works in the accounting department at Gonzaba Medical . . . The meetings were held at Gonzaba Medical's main office, and newly hired providers from the other clinics would come to the main office for the meetings . . . During the meetings, the providers were given lunch, trained on how to add new diagnosis codes, and reminded that they could earn quarterly bonuses for their performance . . .

134. CW1 confirmed that Gonzaba Medical held monthly meetings for its providers that were led by senior Gonzaba Medical management, including Defendant . . . . **William Gonzaba** . . . At these monthly meetings, Defendant . . . **William Gonzaba** . . . "educated" their employees on how to increase the diagnoses, according to CW1. All of the doctors and some specialists (i.e., nephrology, cardiology, etc.) were regularly directed to attend the provider meetings.

*ECF No. 104* at 31–41 (emphasis added). These allegations do not demonstrate William Gonzaba actually knew, deliberately ignored, or recklessly disregarded a falsity submitted to CMS in exchange for payment. For example, while Traver first claims, in a conclusory fashion, William Gonzaba orchestrated the purported scheme by "training providers to inflate diagnoses during regular training meetings," Traver later states it was "[t]he nurses in the RMH Department" that

trained the physicians. *Id*. at 40. As to the more detailed allegations, these reveal only that William Gonzaba attended the meetings and educated employees. *Id.* at 40–41.

Moving on to David Padilla, Relator alleges:

100. Defendant . . . **David Padilla** orchestrated the scheme to submit false and/or fraudulent claims, records and/or statements to receive increased capitation rates by hiring an unlicensed foreign doctor to mine patient charts, overseeing the department responsible for carrying out the scheme to submit unsupported and/or non-current diagnosis codes to CMS, and training providers to inflate diagnoses during regular training meetings.

101. According to Confidential Witness No. 1 (CW1"), a former medical director at one of the Gonzaba Medical clinics from November 2008 to November 2014, it was the practice of **Defendant [David] Padilla** and Manuel Martinez, a Medical Director for the Gonzaba clinic located in Pleasanton, Texas, to review every medical chart for MA patients and increase the severity of the diagnoses . . .

109. According to CW1, who was with Gonzaba Medical from November 2008 to November 2014, **Defendant [David] Padilla** and Manuel Martinez routinely hired consultants every six to eight months, with more hired during the months of September to November when there was open enrollment for Medicare Advantage patients . . .

132. The nurses in the RMH Department "trained" the new physicians on how to add new diagnosis codes to the patient's medical file during the physician visit and which codes are higher paying . . .

133. Typically, such training sessions were scheduled on a monthly basis, and were attended by **Defendant [David] Padilla** on most occasions, and occasionally Defendant Gonzaba's sons, Dr. William Gonzaba, a doctor at Gonzaba Medical, or Greg Gonzaba, who works in the accounting department at Gonzaba Medical . . . The meetings were held at Gonzaba Medical's main office, and newly hired providers from the other clinics would come to the main office for the meetings . . . During the meetings, the providers were given lunch, trained on how to add new diagnosis codes, and reminded that they could earn quarterly bonuses for their performance.

134. CW1 confirmed that Gonzaba Medical held monthly meetings for its providers that were led by senior Gonzaba Medical management, including Defendant . . . **[David] Padilla**. At these monthly meetings, Defendant . . . **[David] Padilla** "educated" their employees on how to increase the diagnoses, according to CW1. All of the doctors and some specialists (i.e., nephrology, cardiology, etc.) were regularly directed to attend the provider meetings . . .

23

135. According to CW1, Gonzaba Medical management routinely held weekly meetings every Thursday from 12 pm to 1 pm central time to review the top ten percent of high utilizers, namely the sickest patients who needed the most medical resources and therefore were the most expensive patients for Gonzaba Medical to provide care. These weekly meetings, known within Gonzaba Medical as the "High Risk" meetings, were mandatory for all the doctors at Gonzaba Medical, and were usually held by teleconference.

136. Discussion at the High Risk meetings often included direction by management to increase patient diagnoses, so as to increase the Case Mix Index and the fee per member per month paid to Gonzaba Medical. Defendant **[David] Padilla** and [Mary] Unger routinely attended and led the meetings.

137. At the High Risk meetings, [Mary] Unger and Defendant **[David] Padilla** encouraged the physicians to make sure they documented every possible diagnosis, even if not treated or current. **[David] Padilla** and [Mary] Unger told the Gonzaba Medical doctors that the documentation brings in the revenue, and Gonzaba Medical gets a monthly capitation payment regardless of whether the patient comes into Gonzaba Medical for any services . . .

139. The physicians at Gonzaba Medical had a "quarterly quota" for Medicare Advantage patients, according to CW1. If a physician hit his or her quota, the physician received approximately $5,000 as a bonus for that quarter. During the weekly High Risk meetings, **Defendant [David] Padilla** and [Mary] Unger routinely pushed the bonus incentive to the physicians.

*ECF No. 104* at 31–42 (emphasis added). Again, these allegations do not demonstrate David Padilla actually knew, deliberately ignored, or recklessly disregarded a falsity submitted to CMS in exchange for payment. The Court repeats that, for example, while Traver first claims, in a conclusory fashion, David Padilla orchestrated the purported scheme by "training providers to inflate diagnoses during regular training meetings," Traver later states it was "[t]he nurses in the RMH Department" that trained the physicians. *Id.* at 40. As to the more detailed allegations, these reveal only that David Padilla hired consultants, attended and led the meetings, and educated employees. *Id.* at 40–41. Traver claims "Defendant Padilla encourages the physicians to make sure they documented every possible diagnosis, even if not treated or current," but Traver provides no examples from the "two such meetings with Dr. Padilla" that "she attended" or the

24

meetings attended by Confidential Witness 1 ("CW1"). *Id*. at 40. Further, Traver claims CW1 corroborates what allegedly occurred at the meetings but acknowledges CW1 worked "with Gonzaba Medical from November 2008 to November 2014," approximately three years prior to Traver's employment with Gonzaba Medical. *Id*. at 31–32.

Additionally, without any facts alleging a connection to Gonzaba Medical, William Gonzaba, or David Padilla's actual reporting to the government, the Third Amended Complaint does not particularly or plausibly plead any form of the required scienter. *King ex rel. United States v. Methodist Hosp. of Dallas*, No. 3:21-CV-01923, 2024 WL 967847, at *7 (N.D. Tex. Mar. 6, 2024) (citing *Longhi*, 575 F.3d at 468); *see also Grubbs*, 565 F.3d at 192. Even assuming Gonzaba Medical's senior leadership learned of the purported scheme from Traver and did nothing, that does not establish plausible conscious indifference or recklessness as there is no factual connection to a *reporting* of false claims, which they ignored or would have known about.[12] Therefore, it is not plausible, let alone particularly pled, from the face of the Third Amended Complaint that Gonzaba Medical, William Gonzaba, or David Padilla had the scienter required for Traver's fraud claims.[13]

For these reasons, the allegations, individually and collectively, cannot serve as basis for a violation of the FCA. With these deficiencies, Traver fails to allege sufficient detail to support the second element of the causes of action for violation of the FCA based upon these liability theories. For this reason, the Court will not analyze whether Traver satisfies the pleading re-

---

[12] *U.S. ex rel. Long v. GSD & M Idea City LLC*, No. 3:11-CV-1154, 2013 WL 214590 (N.D. Tex. Jan. 18, 2013) ("But the scienter element is not met by allegations of 'mere negligence or even gross negligence.'") (quoting *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008)); *see also United States ex rel. Miniex v. Houston Hous. Auth., et al.*, No. 21-20435, 2023 WL 6174416, at *6 (5th Cir. Sept. 22, 2023) (affirming dismissal when the relator pled no facts demonstrating that the defendants knew that they were breaking contractual obligations or had acted with reckless disregard); *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 636 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019) (affirming the dismissal of a FCA claim when no allegations indicated that the defendants knew they had acted wrongfully).

[13] *E.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) ("The plaintiffs must set forth specific facts supporting an inference of fraud.").

quirement of elements (1), a false statement or fraudulent course of conduct, (3), materiality, and (4), that caused the government to pay out money or forfeit moneys due, based upon the theories listed above.

### c.    Summary

Having carefully considered the parties' arguments and after careful review of Traver's Third Amended Complaint, including the excerpts included above, the Court finds Traver does not satisfy the strict and heightened pleading requirements of Federal Rule 9(b) as to her liability theories asserted against Defendants Gonzaba Medical Group, William Gonzaba, and David Padilla. Additionally, Traver does not satisfy the FCA substantive requirement of scienter. Accordingly, Defendants Gonzaba Medical Group, William Gonzaba, and David Padilla's Motions to Dismiss, (*ECF No. 109, 110, 111*), will be granted.

## C.    United, WellMed, and Amerigroup

Again, due to Traver's collective pleading, and the fact that Traver does not connect specific allegations to specific causes of action, the Court's efforts largely focus on attempting to construe Traver's Third Amended Complaint. *See generally*, *ECF No. 104*. Under a section titled "UNITED/WELLMED AND [AMERIGROUP] KNOWINGLY SUBMITTED INFLATED DIAGNOSIS CODES AND CERTIFICATIONS TO CMS AND/OR FAILED TO RETURN OVERPAYMENTS," Traver appears to assert as the primary theory of liability relating to Defendants United, WellMed, and Amerigroup, that these Defendants: (1) knew diagnosis codes submitted by physicians were false, (2) failed to take steps to correct the false diagnosis codes, and (3) ultimately submitted the false diagnosis codes to CMS. *Id*. at 41–44.

### 1.    Liability Theory: Knowledge of False Diagnosis Codes, Failure to Correct False Diagnosis Codes, and Submission of False Diagnosis Codes

The following allegations pertaining to this liability theory are excerpted from the Third Amended Complaint:

147. [E]ach [Medicare Advantage ("MA")] Organization, including WellMed and [Amerigroup], is required to certify, based on knowledge, information, and belief, that the risk adjustment data it submits annually to CMS is accurate, complete, and truthful . . .

151. MA Organizations also have "an obligation to undertake 'due diligence' to ensure the accuracy, completeness, and truthfulness of encounter data submitted." MA Organizations "will be held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted." . . .

152. [Traver]'s department would have been responsible for providing documents in response to an inquiry by an MA Organization related to any audit, monitoring, or due diligence conducted to ensure the accuracy of data submitted by Gonzaba Medical. During [Traver]'s time with Gonzaba Medical, [Traver] was not aware of any inquiries made by a MA Organization.

153. Personnel at United taught personnel at Gonzaba Medical how to increase the diagnoses for Medicare Advantage patients in order to get higher payments, according to CW1 . . .

154. United's average risk scores have been found to be significantly inflated. UnitedHealth Group's average 2021 risk score, in particular, was "significantly larger" than even the already-inflated MA industry average (.28 higher, compared to .19).

155. United and [Amerigroup] engaged in their own one-way chart review processes by reviewing medical charts retrieved through providers to identify diagnosis codes that may be supported by documentation in the charts but had not been included by providers.

156. United hired medical coders to review the available medical charts retrieved from providers to identify diagnosis codes before these diagnoses were submitted to CMS.

157. Anthem [Corporation] and its subsidiaries, including on information and belief [Amerigroup], engaged a vendor to conduct these chart reviews.

158. While the goal of this chart review process was to identify additional diagnoses not included by providers, in the process of conducting chart reviews, United and [Amerigroup], also became aware through this process of the high frequency of diagnoses submitted by providers not being supported by patient medical records . . .

162. In order to submit risk adjustment diagnosis data to CMS, MA Organizations, including United and [Amerigroup], are required to enter Electronic Data Interchange ("EDI") agreements with CMS that require the MA Organizations to take on specific obligations regarding their data submissions, including to "research and correct risk adjustment data discrepancies."

163. United and [Amerigroup] disregarded these duties despite their knowledge that diagnoses codes submitted to by providers were frequently incorrect. The chart reviews provided them with knowledge of the falsity of diagnoses submitted by providers such as Gonzaba Medical when the chart reviewers failed to identify diagnoses codes from the provider's patient records that the provider had submitted. Nevertheless, United and [Amerigroup] failed to take steps to detect and correct false diagnosis codes submitted by providers including Gonzaba Medical . . .

166. Because the information submitted by or on behalf of United and [Amerigroup] was not accurate to the best of their knowledge, information, and belief, these certifications were false.

167. United's and [Amerigroup]'s knowledge, including knowledge gained from the chart review process, that the diagnosis codes submitted by providers, including the Gonzaba Defendants, were not accurate meant that United and [Amerigroup] were aware of compliance risks relating to the risk adjustment data submitted by the Gonzaba Defendants. The certification submitted by or on behalf of United and [Amerigroup] as to the accuracy of the data submitted were false when submitted because United and [Amerigroup] failed to conduct due diligence into the accuracy of the risk adjustment data submitted by the Gonzaba Defendants.

168. If United and [Amerigroup] had effective compliance programs and conducted due diligence to ensure the accuracy of the risk adjustment data and certifications submitted to CMS, they were aware of compliance risks relating to the risk adjustment data submitted by Gonzaba Medical, including:
- lack of support in patient records for current diagnoses submitted by Gonzaba Medical;
- old diagnoses no longer being treated included as current diagnoses; and
- that an unusually high percentage of patients with certain conditions were diagnosed with the higher risk related diagnoses, including, for example, a high percentage of patients with diabetes also diagnosed with diabetic retinopathy and diabetic nephropathy, and a high percentage of patients with hypertension also diagnosed with arthritis, glaucoma, coronary disease, debility, and/or pulmonary hypertension syndrome.

169. Through their compliance programs and due diligence, United and [Amerigroup] either knew that the diagnoses codes submitted by Gonzaba Medical were

not accurate, complete and truthful and were, in fact, factually false, and/or United and [Amerigroup] lacked effective compliance programs and failed to undertake effective due diligence to ensure the accuracy of the risk assessment data submitted by Gonzaba Medical, and, therefore, acted with deliberate ignorance or reckless disregard as to the truth or falsity of the diagnoses codes submitted by Gonzaba Medical.

170. United and [Amerigroup] were aware that the diagnosis codes submitted by Gonzaba Medical were the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status. United and [Amerigroup] deliberately ignored or recklessly disregarded information about accuracy of diagnoses submitted by Gonzaba Medical, failed to delete invalid diagnoses, and therefore were unable to truthfully represent that their data is accurate, complete, and truthful, as the attestations require. United and [Amerigroup] should have recognized the pattern of higher paying diagnosis codes in the risk adjustment data submitted by Gonzaba Medical as red flags that should have prompted an investigation. However, United and [Amerigroup] failed to question Gonzaba Medical's practices.

171. United and [Amerigroup] knew that the submission of diagnosis data and failure to correct that diagnosis data is material not only to payments made by CMS to MA Organizations, but also to adjustments to those payments during the reconciliation process—in other words, to United and [Amerigroup]'s obligation to return payments to CMS.

172. CMS relies on MA Organizations to correct false diagnosis data that was previously submitted, and conducts annual reconciliation calculations of risk scores "to determine if adjustments to payments are necessary." 42 C.F.R. § 422.310(g)(2). By failing to correct previously submitted diagnosis data, United and [Amerigroup] fraudulently avoid obligations to return overpayments to CMS.

*ECF No. 104* at 44–47.

### a.    Whether Relator's Pleading Satisfies Rule 9(b)

#### i.    Particular Details of the Alleged Scheme

Defendants United, WellMed, and Amerigroup move to dismiss Traver's FCA causes of action because Traver's Third Amended Complaint fails to offer plausible and particular allegations detailing the overall scheme. *ECF No. 106* at 19*; ECF No. 108* at 8. Having carefully reviewed Traver's Third Amended Complaint, the Court agrees, finding Traver fails to plead fraud with sufficient fact-based particularity.

29

As stated, in this case, the purported scheme does not involve any instance in which a specific false claim for payment by the government was submitted. However, this purported scheme could still support a cause of action under the FCA if Traver can sufficiently identify particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. *Grubbs*, 565 F.3d at 190.

The Court repeats that, put simply, Rule 9(b) requires the "who, what, when, where, and how" of the fraud. *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Dismissal is appropriate if Traver offers only conclusory allegations, or if Traver cannot offer factual information with sufficient indicia of reliability or cannot demonstrate a strong inference that United, WellMed, and Amerigroup caused fraudulent claims to be submitted for payment by Medicare. *Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013).

Reviewing Traver's Third Amended Complaint, Traver does not tie any non-conclusory allegations regarding the purported fraud to United, WellMed, and Amerigroup, with the requisite particularity. Regarding this theory of liability, Traver alleges "[p]ersonnel at United taught personnel at Gonzaba Medical how to increase diagnoses for Medicare Advantage patients in order to get higher payments, according to CW1," but Traver does not identify any individual—either by name or title—who actually engaged in this activity on behalf of United (or WellMed, because Relator groups these two defendants together). *ECF No. 104* at 42. Similarly, Traver alleges that "in the process of conducting chart reviews, United and [Amerigroup], also became aware . . . of the high frequency of diagnoses submitted by providers not being supported by patient medical records," but there are no particularized allegations of how, when, and why United,

WellMed, and/or Amerigroup "became aware" or how, when, and why United, WellMed, and/or Amerigroup knew any diagnosis codes were false. Traver alleges only, in a conclusory fashion, that "United and [Amerigroup] failed to take steps to detect and correct false diagnosis codes submitted by providers including Gonzaba Medical" and "[t]he certification submitted by or on behalf of United and [Amerigroup] as to the accuracy of the data submitted were false when submitted because United and [Amerigroup] failed to conduct due diligence into the accuracy of the risk adjustment data submitted by the Gonzaba Defendants." *Id*. at 43–45. Without more, these allegations do not rise above a speculative level.

Accordingly, the Court finds the Third Amended Complaint fails to plead the purported fraud in this case with sufficient particularity.

#### ii. Reliable Indicia Leading to a Strong Inference of Improper Billing

The Court repeats that in *Grubbs* the Fifth Circuit found the relator provided reliable indicia to support his allegations by stating "the particular workings of a scheme [that were] communicated directly to the relator by those perpetrating the fraud," and the relator "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors . . . attempted to bring him into the fold of their on-going fraudulent plot." *Grubbs*, 565 F.3d at 191–92. The *Grubbs* relator also corroborated this allegation with descriptions of a meeting with nurses who tried to help him carry out the scheme, along with specific dates on which "each doctor falsely claimed to have provided services to patients." *Id.* at 192.

Here, like the allegations relating to Defendants Gonzaba Medical, William Gonzaba, and David Padilla, Traver does not allege anyone within United, WellMed, or Amerigroup communicated to her the workings of any fraud of billing Medicare or that she viewed any other indicia, like internal documents, evidencing such purported fraud or evidencing United, WellMed, or

31

Amerigroup's intention to improperly bill knowing any improper charges would be recovered from Medicare. *See Grubbs*, 565 F.3d at 191; *U.S. v. Cath. Health Initiatives*, No. 4:18-CV-123, 2022 WL 2657131, at *10 (S.D. Tex. Mar. 31, 2022)*, R. & R. adopted*, 2022 WL 2652135 (S.D. Tex. July 8, 2022). In Traver's Third Amended Complaint, Traver also does not allege that facts relating to the purported fraud are peculiarly within defendants' knowledge. [14] *See generally, ECF No. 104*. Still, even when the facts relating to the alleged fraud *are* peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his [or her] belief." *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.,* 417 F.3d 450, 454 (5th Cir. 2005) (emphasis added). Here, Traver neither contends these facts are peculiarly within United, WellMed, and Amerigroup's knowledge nor sets forth the factual basis for her beliefs regarding these Defendants.

Thus, because Traver's pleading lacks both particular details and reliable indicia, Traver fails to plead anything that provides a strong inference that United, WellMed, and Amerigroup violated the FCA.

    **b.    Whether Relator's Pleading Satisfies the FCA Substantive Requirements**

    **i.  Requisite Scienter**

Like Defendants Gonzaba Medical, William Gonzaba, and David Padilla, Defendants United, WellMed, and Amerigroup also move to dismiss Traver's FCA causes of action on sub-

---

[14] Allegations of the circumstances of a fraud based on information and belief, which are commonplace and often a necessity in many litigation contexts, usually do not satisfy the particularity requirement of Rule 9(b), unless accompanied by a statement of the facts upon which the pleader's belief is founded or by allegations that the necessary information lies within the defendant's control. Thus, Rule 9(b)'s fraud pleading requirement should not be understood to require absolute particularity as to matters peculiarly within the opposing party's knowledge that the pleader is not privy to at the time of the pleading and that can only be developed through discovery.

§ 1298 Pleading Fraud With Particularity—Extent of Requirement, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.):

stantive grounds. *See ECF Nos. 106, 108*. Again, like Defendants Gonzaba Medical, William Gonzaba, and David Padilla, these Defendants establish the Third Amended Complaint does not sufficiently allege the requisite scienter. *ECF No. 106* at 25–27; *ECF No. 108* at 14–20; *ECF No. 111* at 16–17.

The Court repeats that the FCA's scienter requirement is high, and a relator may not simply allege that "the defendants knowingly did this or recklessly did that." *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994). The FCA's scienter element requires (1) "actual knowledge of falsity," (2) "deliberate ignorance of the truth or falsity of the information provided," or (3) "reckless disregard of the truth or falsity of the information provided." *U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458, 468 (5th Cir. 2009). The defendant must also act "with the purpose of getting a false claim paid by the Govern-ment." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009).

As stated, under a section titled "DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED FALSE OR FRAUDULENT CLAIMS," Traver appears to ad-dress scienter with the following allegations:

> 176. By their conduct alleged in this complaint, each Defendant knowingly pre-sented or caused to be presented, false or fraudulent claims; knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; knowingly made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Gov-ernment; and knowingly concealed and improperly avoided or decreased an obli-gation to pay or transmit money to the United States.

> 177. All of the Defendants knew that the intended and foreseeable consequence of their fraudulent scheme was the overpayment of claims submitted or caused to be submitted to the United States, or failure to return overpayments, pursuant to the Medicare Advantage program . . .

> 179. Defendants knew that truthful submission of encounter data, including diag-nosis codes, is material to Medicare's decision to pay claims and is a material re-quirement of United's and WellMed's contracts with the United States, which re-

quirements flowed to Gonzaba Medical. Defendants knew that the falsification of diagnosis codes is not only "capable of influencing," but in fact directly affects, the amount of reimbursement under the MA Program and renders the claim, via the encounter data, factually false.

180. As alleged throughout this complaint, each Defendant acted with actual knowledge that the diagnoses codes submitted by Gonzaba Medical to WellMed and [Amerigroup], and from United and [Amerigroup] to the United States, were not accurate, complete and truthful and were, in fact, factually false.

181. Alternatively, each Defendant acted with deliberate ignorance or reckless disregard as to the truth or falsity of the diagnoses codes submitted by Gonzaba Medical to WellMed and [Amerigroup], and from WellMed and [Amerigroup] to the United States.

*ECF No. 104* at 50–54. Again, like Defendants Gonzaba Medical, William Gonzaba, and David Padilla, Traver's "vague group pleading approach cripples [her] ability to establish scienter."[15] Additionally, the Court cannot accept these allegations relating to scienter as sufficient because they are conclusory. These allegations therefore do not demonstrate that United, WellMed, and Amerigroup actually knew, deliberately ignored, or recklessly disregarded a falsity submitted to CMS in exchange for payment.

Specifically regarding Defendants United, WellMed, and Amerigroup, Traver's Third Amended Complaint simply contains no detailed allegations Defendants United, WellMed, and Amerigroup were aware of the purported fraud. The closest Traver's Third Amended Complaint comes to acknowledging these Defendants' knowledge are the following allegations:

154. United's average risk scores have been found to be significantly inflated. UnitedHealth Group's average 2021 risk score, in particular, was "significantly larger" than even the already-inflated MA industry average (.28 higher, compared to .19).

155. United and [Amerigroup] engaged in their own one-way chart review processes by reviewing medical charts retrieved through providers to identify diagno-

---

[15] *U.S. ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 4:21-CV-02024, 2023 WL 2563239, at *10 (S.D. Tex. Feb. 10, 2023), R. *& R. adopted sub nom. Frey v. Health Mgmt. Sys., Inc.*, No. 4:21-CV-02024, 2023 WL 2564342 (S.D. Tex. Mar. 17, 2023) (citing *U.S. ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 636 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019)).

sis codes that may be supported by documentation in the charts but had not been included by providers . . .

158. While the goal of this chart review process was to identify additional diagnoses not included by providers, in the process of conducting chart reviews, United and [Amerigroup], also *became aware* through this process of the high frequency of diagnoses submitted by providers not being supported by patient medical records . . .

167. United's and [Amerigroup]'s *knowledge, including knowledge gained from the chart review process*, that the diagnosis codes submitted by providers, including the Gonzaba Defendants, were not accurate meant that United and [Amerigroup] were aware of compliance risks relating to the risk adjustment data submitted by the Gonzaba Defendants . . .

169. Through their compliance programs and due diligence, United and [Amerigroup] either *knew* that the diagnoses codes submitted by Gonzaba Medical were not accurate, complete and truthful and were, in fact, factually false, and/or United and [Amerigroup] lacked effective compliance programs and failed to undertake effective due diligence to ensure the accuracy of the risk assessment data submitted by Gonzaba Medical, and, therefore, acted with deliberate ignorance or reckless disregard as to the truth or falsity of the diagnoses codes submitted by Gonzaba Medical.

170. United and [Amerigroup] *were aware* that the diagnosis codes submitted by Gonzaba Medical were the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status. United and [Amerigroup] deliberately ignored or recklessly disregarded information about accuracy of diagnoses submitted by Gonzaba Medical, failed to delete invalid diagnoses, and therefore were unable to truthfully represent that their data is accurate, complete, and truthful, as the attestations require. United and [Amerigroup] should have recognized the pattern of higher paying diagnosis codes in the risk adjustment data submitted by Gonzaba Medical as red flags that should have prompted an investigation. However, United and [Amerigroup] failed to question Gonzaba Medical's practices.

171. United and [Amerigroup] *knew* that the submission of diagnosis data and failure to correct that diagnosis data is material not only to payments made by CMS to MA Organizations, but also to adjustments to those payments during the reconciliation process—in other words, to United and [Amerigroup]'s obligation to return payments to CMS.

*ECF No. 104* at 41–47 (emphasis added). While Traver alleges United and Amerigroup "*became*

*aware* through [the chart review] process of the high frequency of diagnoses submitted by pro-

viders not being supported by patient medical records," Traver does not identify any individual—either by name or title—who made these discoveries or when the chart review process occurred. *Id*. (emphasis added). Further, because Traver's Third Amended Complaint does not sufficiently segregate the alleged wrongdoing, as pleaded the Court can only conclude it is possible—not plausible—United, WellMed, and Amerigroup (or any combination, or none) knew diagnoses codes allegedly submitted were false. *E.g.*, *U.S. ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, No. 3:14-CV-00118, 2016 WL 5661644, at *9 (N.D. Tex. Sept. 30, 2016).

For these reasons, the allegations, individually and collectively, cannot serve as basis for a violation of the FCA. With these deficiencies, Traver fails to allege sufficient detail to support the second element of the causes of action for violation of the FCA based upon these liability theories. For this reason, the Court will not analyze whether Traver satisfies the pleading requirement of elements (1), a false statement or fraudulent course of conduct, (3), materiality, and (4), that caused the government to pay out money or forfeit moneys due, based upon the theory listed above.

### c.    Summary

Having carefully considered the parties' arguments and after careful review of Traver's Third Amended Complaint, including the excerpts included above, the Court finds Traver does not satisfy the strict and heightened pleading requirements of Federal Rule 9(b) as to her liability theory asserted against Defendants United, WellMed, and Amerigroup. Additionally, Traver does not satisfy the FCA substantive requirement of scienter. Accordingly, Defendants United, WellMed, and Amerigroup's Motions to Dismiss, (*ECF No. 106, 108*), will be granted.

### D.    Reverse False Claim

36

To the extent Traver is permitted to simultaneously assert a reverse false claim liability cause of action pursuant to 31 U.S.C. § 3729(a)(1)(G), the Court also finds its fails.[16] The elements of a 31 U.S.C. § 3729(a)(1)(G) cause of action are as follows: (1) a false record is created; (2) the provider knows the record is false; (3) the false record or statement is made, used, or caused to be made or used; (4) to conceal, decrease, or avoid an obligation to pay the government; and (5) the misrepresentation is material. *U.S. ex rel. Ligai v. ETS–Lindgren Inc.,* No. H–112973, 2014 WL 4649885 at *12 (S.D. Tex. Sept.16, 2014); *see also U.S. ex rel. Johnson v. Kaner Med. Grp., P.A.*, No. 4:12-CV-00757, 2015 WL 631654 at *7–8 (N.D. Tex. Feb. 12, 2015), *aff'd*, 641 F. App'x 391 (5th Cir. 2016). Traver's Third Amended Complaint contains little relating to this cause of action and the scant allegations are not directed to the elements. *See*, *ECF No. 104* at 57–63. Further, in Relator's Omnibus Response, the Court finds Relator cites allegations included in the Third Amended Complaint that are either conclusory or unspecified. *See ECF No. 121* at 45–46. Thus, for these reasons and for the reasons stated in the Court's analyses above relating to Defendants' knowledge of any purported false record, Defendants Gonzaba Medical, William Gonzaba, David Padilla, United, WellMed, and Amerigroup's Motions to Dismiss, (*ECF Nos. 106, 107, 108, 109, 110, 111*), in this regard will also be granted.

### E.    Amendment of Third Amended Complaint

---

[16]    A defendant's mere failure to refund false claims the Government paid is not actionable as a reverse false claim . . . The purpose of a reverse false claim cause of action is to ensure that a person who makes a false statement to avoid paying money owed to the Government is equally liable under the FCA as if that person had submitted a false claim to receive money. [*U.S. ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010))].The reverse false claim provision of the FCA is thus intended to address conduct that would otherwise escape liability under the FCA, not to provide a duplicate basis to assert a false statement claim under the Act. *Id.* (citing *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338-39 & n.142 (S.D.N.Y. 2004)). Here, Relator's reverse false claim merely alleges that Human and Tufts failed to refund capitated payments they were not entitled to receive. Thus, the claim is not separately actionable under § 3729(a)(1)(G).

*U.S. ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, No. 3:14-CV-00118, 2016 WL 5561644, at *11–12 (N.D. Tex. Sept. 30, 2016) (collecting cases).

Prior to dismissal of a complaint, a court must "freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave to amend is within the sound discretion of the court and can be appropriately denied when "it is clear that the defects [of a complaint] are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

The Court's Order issued August 25, 2025, details the actions and efforts of the Court, including the U.S. Magistrate Judge, and the parties to facilitate several opportunities for Traver to cure all pleading defects prior to submission of the pending motions to dismiss. *See ECF Nos. 95, 103.* Based upon this procedural posture and the Court's admonitions, the Court finds Traver was provided ample opportunity to satisfy Federal Rule 15.

## CONCLUSION

For all of the foregoing reasons, the respective motions to dismiss, (*ECF Nos. 106, 108, 109, 110, 111*), are **GRANTED**. Defendants United and WellMed's Motion to Strike, (*ECF No. 107*), is **DENIED AS MOOT**. The Court will issue its final judgment by separate order.

It is so ORDERED.
SIGNED this 6th day of April, 2026.

JASON  PULLIAM
UNITED STATES DISTRICT JUDGE